301 P.2d 723

Sherman S. SMITH, Plaintiff-Appellee,

v.

SPENCE & SON DRILLING COMPANY,
Employer,

Travelers Insurance Company, Carrier,
Defendants-Appellants.

No. 6097.

Supreme Court of New Mexico.

Sept. 19, 1956.

G. T. Hanners, Lovington, for appellants.

Lon P. Watkins, Carlsbad, Jack Underwood, Lovington, for appellee.

SADLER, Justice.

The defendants below being the employer and insurer in the trial of a claim for Workmen's Compensation prosecuted before the district court of Eddy County, complain before this court, as appellants, of a judgment rendered against them upon the verdicts of a jury returned into court at the conclusion of the trial.

The injury on account of which the claim is prosecuted took place on April 3, 1954. The plaintiff was 37 years of age at time of the accidental injury of which he complains. He was married and the father of two children. He had substituted for another man on two occasions and about a week, before his accidental injury he was given steady employment by Spence & Son Drilling Co., hereinafter referred to as "employer" or "main defendant". He drove a truck and served as a driller's helper.

On the day in question, the plaintiff injured his back while in the act of assisting another workman in lifting a heavy steel pan used as a reservoir in which water is run in circulating mud out of a hole. Asked how much the pan weighed, the plaintiff testified:

" * * * Q. About how much does that pan weigh? A. Well, the two of us couldn't pick it up off the ground, if you just reach down and get it. And he had a cable on the small end of it, letting it down on me, and I was walking back with it. And I bent over to set it on the ground, and my back started hurting.

"Q. Well, now, did you set it on the ground? A. No. I didn't get to do that. I dropped it. It was about 12 inches from the ground, and the pain hit me, and I had to drop it.

"Q. Can you describe to the Jury just what kind of pain it was, and where it was? A. Well, it was from my belt line down, and it burnt like fire when it happened. And the next morning I couldn't get out of bed.

"Q. Now, over what section of your body did it burn? A. Well, all from my belt on down to below part of my back bone."

Following his injury the plaintiff remained on the job and worked the remainder of the afternoon, then drove his truck some 50 miles into Lovington. In the weeks and even months after his injury the

plaintiff received treatment or examinations from several physicians, the first of whom was an osteopath and the remainder regular M. D. physicians engaged in the general practice. He was under the care of Dr. Charles Hargreaves of Lovington perhaps a longer time than any other. He happened to be plaintiff's own physician and a general practitioner at Lovington.

He was also examined, although not treated, by two orthopedic physicians and surgeons over the period following injury and prior to suit, namely, Dr. W. Compere Basom of El Paso, Texas, who holds periodic clinics in Hobbs, New Mexico and, also, by Dr. John S. Moore of Roswell, New Mexico. Dr. Basom examined the plaintiff on two occasions and Dr. Moore as many as three times. All took x-ray pictures of plaintiff's back.

The jury would have been warranted in finding from the evidence that the plaintiff as a direct and proximate result of the accident mentioned suffered from herniated disc. A herniated disc is described by one of the physicians as a rupture of the padding between the vertebrae. It was this same witness who gave it as his opinion that he suffered from a herniated disc. He also found some numbness in his right thigh. All told, plaintiff had been treated some 36 times by this same physician. It was he who as one of the physicians testified:

"It (a herniated disc) is the padding squeezed out, so that it puts pressure against some of the spinal nerves, causing pain."

Dr. Basom, a witness for defendants, stated it was quite possible the plaintiff had a herniated disc but that he could not be sure without the Myelogram test, which plaintiff declined to undergo, it being in evidence there was some danger, though not great, incident thereto. This same witness, also, observed a narrowed intervertebral joint between the 2nd and 3rd lumbar vertebrae. This, he described as the degenerative process of the spine and he thought it had been there all the time. The testimony of Dr. Moore, a defense witness, was along the same line.

The plaintiff, himself, testified he had been unable following his injury to do heavy labor. He had endeavored to hold light jobs, but was compelled to abandon even them. He had worked for a time on a used car lot wiping dust off cars. He also took another job of ferrying cars from one point to another but was unable to sit up and drive cars the distance necessary to hold the job and was discharged by reason thereof. He had dropped from 156 pounds to 120 pounds in weight between the date of accident and time of trial.

In addition to testifying he was no longer able to do heavy manual labor, the plaintiff stated that following accident he had

been unable to lace his shoes or to move about in bed, or to bend over. If he turned over on his stomach while in bed, he found himself unable to turn again onto his back without the aid of his wife. He was confirmed in much of this testimony by his wife, and his landlady, who owned an apartment occupied by plaintiff and his wife and children.

Each of the three physicians who appeared in the case, expressed opinions as experts on plaintiff's condition. Dr. Basom thought he had suffered 30 per cent bodily disability. Dr. Moore gave it as his opinion he had suffered 40 per cent bodily disability. Whereas, Dr. Hargreaves, who had actually treated the plaintiff over a period of several months, expressed the view in a report he had signed as of July 3, 1955, that 33⅓ per cent would be a fair estimate of plaintiff's then bodily disability. Explaining this statement on cross-examination, he stated:

"* * * A. I meant, as far as being able to do light work, and all, he still is capable, I think, of being up and around and doing a lot of odds and ends, and earning a small salary, of course; but as far as going out and hiring out for a job, he is likely to be 100 per cent disabled, because he can't do the work."

Notwithstanding Dr. Basom's rating of 30 per cent bodily disability and he had seen him only twice, he had this to say in the course of his examination:

"Q. Assume, sir, a man 37 years old, who went through the eighth grade in school and no further, and who has worked throughout his life, after he got out of school, driving log trucks, working in a saw mill, working at a filling station changing tires, and lastly, working as a driller's helper—which necessitates hard manual labor; who has suffered an injury such as a herniated disk or a lumbosacral sprain: is he able to do 70 per cent of the work he was able to do before he suffered such an injury? A. On the patient who had a very definite herniated disk, and without treatment and without improvement, then I would say that he would be 100 per cent disabled for heavy work. Nearly all the cases, I've seen, however, can do quite a bit of work; and the disability is rated primarily on pain, and that makes the actual rating very difficult.

"Q. Then you just actually can't arrive at a correct rating; is that true? A. On the basis of what I have on Mr. Smith—the medical evidence—it wouldn't go any higher than 30 per cent, at all.

"Q. Now, do you believe, Doctor, from your treatment and examination of Mr. Smith, that he is able to do

hard manual labor? A. I don't think he can do heavy manual labor, with that kind of spine, at all."

It should be mentioned that the plaintiff had a very limited education, having attended school only through the eighth grade. Prior to the date of his injury, the only work in which he had engaged and in which he was capable of rendering qualified service was heavy manual labor. After finishing the eighth grade in school, he worked for a railroad company in Missouri for about three years, carrying cross-ties and loading them on railroad cars. He then moved to Arkansas and, for a time, drove a log truck and worked in a saw mill. This type of job was followed by about ten (10) years spent in a service station as a grease monkey and tire boy.

So much for the facts. At conclusion of the trial, the cause was submitted to the jury on the general issue and on special interrogatories. The general verdict was for the plaintiff. The jury then considered the special interrogatories, to which it supplied answers as indicated below; to-wit:

"1. Do you find by a preponderance of the evidence that claimant sustained disability resulting from accidental injury while employed by Spence and Son Drilling Co.?

Answer Yes or No:          Yes

"2. If you have answered the above question in the affirmative, what percentage of disability, if any, was claimant suffering from this accident on May 15, 1955?

Answer:          100%

"3. If you have answered Question No. 1 above in the affirmative, then do you find claimant is presently disabled as the result of injury sustained by accident while employed by Spence and Son Drilling Co.?

Answer Yes or No:          Yes

"4. If you have answered Question No. 3 "Yes," then state the percentage of disability claimant is now suffering.

Answer:          100%"

Judgment was entered in conformity with the general and special verdicts for compensation due plaintiff and unpaid as for total permanent disability to December 3, 1955 and at rate of $30 per week commencing December 4, 1955, and continuing during the period of plaintiff's total and permanent disability but "not to exceed the period of 550 weeks from April 3, 1954, (date of injury), subject to all of the terms and provisions under the Workmen's Compensation Act of the State of New Mexico." An award to plaintiff of attorneys' fees in the sum of $1,500 was also allowed by the court. The defendants prosecute

this appeal from the judgment so rendered against them.

The first and most vigorously argued point presented for our consideration rests on the claim that there is no substantial evidence in the record to support an award in excess of that being paid at time of trial, namely, $12 per week, based upon a partial permanent disability of forty per cent. In as much as the second point is so closely related to defendants' Point No. 1, the two will be considered and ruled upon together. The second point is as follows:

"100 per cent disability award cannot be sustained where claimant is able to do light work and his doctor testifies to 33⅓ per cent disability."

The facts have been summarized sufficiently to enable us to say they afford substantial evidence in support of the verdicts returned by the jury. Chief reliance is placed by counsel for defendants on our somewhat recent case of Waller v. Shell Oil Company, 60 N.M. 484, 292 P.2d 782, 785. In that case, as here, the claim made was for compensation for total permanent disability on account of a back injury. The jury made an award of 20 per cent partial permanent disability and we reduced it to 10 per cent, the amount agreed by all the medical witnesses, including plaintiff's own physician placed on the stand by him, as extent of his disability. All the medical testimony was based solely on subjective symptons.

Other differences in the two cases arise on the fact that in the Waller case there was no disc injury, no numbness in one of the legs, and the testimony showed claimant was able to perform heavy manual labor, though with some discomfort at times. Here, even the medical witnesses for defense, made no claim the plaintiff was able to perform heavy manual labor, his injured spine being in the condition it appeared to be at the time of examination and treatment. Furthermore, the plaintiff's symptoms in the case at bar were not entirely subjective as in the Waller case.

We think the following language from our opinion in the case of Waller v. Shell Oil Company, supra, will suffice to show such differences in the facts of the two cases as to deny the Waller case character as authority against the judgment rendered in the case at bar. We said:

"We are not unmindful of our earlier cases holding that medical testimony, as other expert testimony, is intended to aid, but not to conclude a court or jury. See Elsea v. Broome Furniture Co., 47 N.M. 356, 143 P.2d 572; Lemon v. Morrison-Knudsen Co., 58 N.M. 830, 277 P.2d 542; Gilbert v. E. B. Law & Son, Inc., 60 N.M. 101, 287 P.2d 992, and Seay v. Lea County Sand & Gravel Co., 60 N.M. [399], 292 P.2d 93, only recently decided. We have no intention of overruling these cases on this subject. Nor do we think

our holding in this case in any way modifies or impairs the decisions mentioned.

"What we here hold is that where a plaintiff's entire case rests upon proof of subjective symptoms and the testimony, not alone of medical experts produced by defendant, but of a physician presented and vouched for by the plaintiff, himself, flatly contradicts the finding of the jury as to the extent of disability, partial in character, it so weakens the testimony relied upon as to deny it substantial character. The persistent effort of plaintiff's counsel to draw from the experts, even his own, the slightest evidence of damage to a disc in the spine ended in complete failure. The same result followed the effort to have confirmation from plaintiff's expert, Dr. McIntire, of the presence of a 'dead spot,' or numbness, in plaintiff's heel.

"Indeed, throughout the testimony failed to show anything beyond soreness from muscular strain, following an unwitnessed accidental injury. * * *"

It should be borne in mind that defendant, neither by pleading nor proof, made any serious contention that the plaintiff did not suffer 40 per cent partial permanent disability. True enough, they expressed the opinion in their pleadings that any disability of a seemingly permanent nature would continue to diminish with treatment and the passage of, time. If it does, of course, the defendants have it within their power by requests for periodic examinations to have the fact ascertained and a corresponding reduction in the amount of compensation payments ordered.

The real basis of the argument for defendants, however, flows from a belief on the part of their counsel that, if an injured workman is able to do "any kind of work," however trivial and unremunerating, not necessarily of the type he had formerly followed and for which alone he is qualified by training, experience, and educational background, he may, nevertheless, not establish a claim for disability of a permanent character, partial or total, as a basis for compensation. We do not think the cases will support them in this contention.

The opposing views on the question were pinpointed at the trial by the court's action in striking from two instructions given, Nos. 5 and 12, immediately preceding the word "work" in each, the words "any kind of." The two instructions, as they were given to the jury in the corrected or amended form, read as follows:

"5. It is provided by our Workmen's Compensation Law [1953 Comp. § 59–10–1, et seq.] that for disability partial in character but permanent in quality, the compensation shall be

measured by the extent of such disability. Partial disability, as those words are used in our Compensation Law and as applied to this case, means that the claimant, solely as the result of such accident, has been, is now and will permanently continue to be partially unable to perform any kind of (initialed CRA) work for which he is fitted by age, education, training, general physical and mental capacity, and previous work experience, as distinguished from total and permanent disability as hereinabove explained to you.

\* \* \* \* \* \*

"12. If you do not find that the claimant is totally and permanently disabled, as those words have hereinabove been explained to you, you should then consider and determine whether the claimant, solely as a result of such accident, is partially but permanently disabled, to some percentage extent, from performing any kind of work for which he is fitted by age, education, training, general physical and mental capacity and mental capacity and previous work experience; and if you find from a preponderance of the evidence that the claimant is partially and permanently disabled to some extent, you should then determine the percentage extent of such partial permanent disability. In determining whether the claimant is now and will continue to be partially and permanently disabled to some percentage extent, you should take into consideration the same factors of age, education, training, general physical and mental capacity and previous work experience as hereinabove set forth."

It will be noted that the exact point to defendants' objection to instructions Nos. 5 and 12 is upon the deletion therefrom of the words "any kind of" (work). In urging this objection their counsel place great reliance upon the case of Helms v. New Mexico Ore Processing Co., 50 N.M. 243, 175 P.2d 395, 399, and the claimed approval of that opinion in the later case of Gerrard v. Harvey & Newman Drilling Co., 59 N.M. 262, 282 P.2d 1105. The particular language invoked in the Helms case is to be found in the opinion of which Mr. Justice Hudspeth is the author, reading as follows:

"This and other provisions of the statute clearly indicate that the proper test is not whether the injured workman is able to do the same kind of work as he did before the injury, but whether he is able to do any kind of work."

A reference to the report of the Helms case will disclose that the opinion of Mr. Justice Hudspeth, appearing first in the report of the case, was signed by Mr. Justice Bickley, alone. The opinion of Mr. Justice Brice, specially concurring in the

result announced by Mr. Justice Hudspeth, and concurred in by the writer, as then Chief Justice and Mr. Justice Lujan, had this to say regarding the above quoted portion of the opinion in the Helms case, to-wit:

"I do not pass upon the question; but I do not subscribe to the doctrine stated by Mr. Justice Hudspeth, 'This and other provisions of the statute clearly indicate that the proper test is not whether the injured workman is able to do the same kind of work as he did before the injury, but whether he is able to do *any kind of work.*'

"That this statement is too broad is quite evident. I know of no case going so far. The workman would have to be paralyzed before it could be said that he was totally disabled. See Cleland v. Verona Radio, 130 N.J.L. 588, 33 A.2d 712."

It is the language just quoted from the specially concurring opinion of Mr. Justice Brice which, alone, has the support of a majority of the court and represents the law on the disputed issue, in so far as any law is to be deduced from the decision in that case. As a matter of fact, the majority of the Court expressly declined to construe the words "permanent and total disability," as used in Workmen's Compensation Act, beyond indicating an unwillingness to accept the construction of such words proposed by Justices Hudspeth and Bickley and quoted, supra. The majority view was expressed by Mr. Justice Brice, as follows:

"In my opinion it is not necessary to construe the words 'permanent, total disability' as used in the Workmen's Compensation Act. This question has been posed in at least three cases (Lipe v. Bradbury, 49 N.M. 4, 154 P. 2d 1000; New Mexico State Highway Dept. v. Bible, 38 N.M. 372, 34 P.2d 295; Bubany v. New York Life Ins. Co., 39 N.M. 560, 51 P.2d 864) and not decided because unnecessary to a decision in any of them. While the question was raised in this case, it is unnecessary to a decision and I see no reason for deciding it at this time."

The defendants find themselves as barren of decisive authority on the question at issue in pointing to the case of Gerrard v. Harvey & Newman Drilling Co., supra, and quoting therefrom, as they do in the Helms case. Actually, since two of the justices in the Gerrard case dissented and two specially concurred, the opinion of Mr. Justice Kiker becomes a majority opinion upon the single point upon which he and the specially concurring justices agree, namely, the award of a new trial for error in giving Instruction No. 5, as mentioned in the specially concurring opinion. Thus it is that neither the Helms case nor the Gerrard case can be a source

440

of comfort to the position of defendants in the case at bar.

■ Frankly, we find ourselves no more called upon here than did the majority in the case of Helms v. New Mexico Ore Processing Co., supra, to attempt by construction a precise definition of the words " 'permanent, total disability' " as used in our Workmen's Compensation Act. It is enough to say here, as the Court said in the Helms case that confining the meaning of the questioned words to the ability "to do any kind of work" gives them too broad an application. Compare Lipe v. Bradbury, 49 N.M. 4, 154 P.2d 1000. It is enough to say here, as we did in last cited case, that the evidence is sufficient to support a verdict of total, permanent disability.

■ Finally, the defendants say the court erred in giving its Instruction No. 14A, reading:

"In this connection you are instructed that the medical witnesses are not received as experts on economic consequences of an injury, and in this field you will not let the physicians substitute their judgment for yours. ~~as to the economic effects of a given injury on plaintiff's ability to earn a living~~. CRA."

Here, again, counsel rely solely on what should be described as the minority views of two Justices of this Court in the case of Helms v. New Mexico Ore Processing Co., supra, as support for the claim of error made.

It perhaps would have been better if the trial court had omitted this instruction altogether, thus declining to touch upon the field of economics. We find in the record, however, no evidence of any of the medical witnesses attempting to give expert testimony on the economic consequences of plaintiff's injury, being careful to confine their testimony as experts to the percentage of bodily disability he had suffered. Two of such witnesses expressly disclaimed any intention to speak on the subject of the economic consequences of the plaintiff's injury.

Thus, it seems a more pertinent objection would have been that the questioned instruction injected a false issue, there being no testimony wherein a physician had attempted, as an expert, to speak on the subject of economic consequences of the injury. Whatever view be taken of the matter, we can see no harm to defendants.

■ The plaintiff will be allowed the sum of $500 as attorneys fees for services of his attorneys in this Court. It is to be remembered that the defendants acknowledged liability for a forty per cent partial permanent disability in this case.

Finding no error, the judgment will be affirmed.

It is so ordered.

COMPTON, C. J., and LUJAN and KIKER, JJ., concur.

McGHEE, Justice (dissenting).

The award of 100% disability is too high. I dissent.